[No. B002424. Second Dist., Div. Three. Sept. 7, 1984.]

MITSUI MANUFACTURERS BANK, Plaintiff and Respondent, v.
TEXAS COMMERCE BANK-FORT WORTH,
Defendant and Respondent;
SIMON MARKETING, INC., Defendant and Appellant.

## COUNSEL

Rosenfeld, Falk, Parnell & Shames, Edward M. Rosenfeld, Henry J. Shames and Phyllis Kupferstein for Defendant and Appellant.

Douglas R. Little, Liddell, Sapp, Zivley, Brown & LaBoon, Howard O. Boltz, Jr., and Kadison, Pfaelzer, Woodard, Quinn & Rossi for Defendant and Respondent.

No appearance for Plaintiff and Respondent.

## OPINION

**SOVEN, J.**\*—Plaintiff Mitsui Manufacturers Bank issued a letter of credit in favor of defendant and respondent Texas Commerce Bank-Fort Worth

---

\*Assigned by the Chairperson of the Judicial Council.

(TCB), at the request of defendant and appellant Simon Marketing, Inc. (Simon). Mitsui filed a complaint for declaratory relief in connection with the letter of credit. Appellant Simon moved for a preliminary injunction against respondent TCB. The trial court denied the motion, and Simon has appealed. Plaintiff Mitsui is not involved in this appeal.[1] We reverse.

*Facts*

In November 1982, appellant Simon entered into a complex transaction, part of which involved an agreement that "Craigmuir" would lend Simon money to finance an oil drilling program.[2] Craigmuir agreed to borrow the funds from respondent TCB. To provide security for this loan, Simon arranged for plaintiff Mitsui to issue a letter of credit in the amount of $2.8 million naming TCB as the beneficiary.

The letter of credit provided, as relevant, that a request for payment from TCB "must be accompanied by beneficiary's signed statement stating that Craigmuir Limited has failed to meet its obligations to pay the face amount of loans drawn by themselves on beneficiary [TCB] in connection with drilling of oil wells for Simon Oil Co., Ltd." The letter of credit could be drawn upon not before December 1, 1983, December 1, 1984, and November 24, 1985, each drawing for $933,333. TCB has already drawn on the funds that were available as of December 1, 1983.

The quoted language, at least in part, was inserted at the request of TCB. At the loan closing, Craigmuir submitted to TCB several documents, including the letter of credit and a 100-page tax opinion.[3]

The tax opinion, at pages three and four, stated that Simon planned to engage in acquiring certain oil fields "and drilling and operating wells thereon," and that Simon would borrow $2.8 million "from Craigmuir using the letter of credit as security for such loan."

The transaction involved Craigmuir and several other business entities, all of which were controlled by one Albion Norman. He advised TCB that

---

[1] Plaintiff Mitsui supported the issuance of a preliminary injunction in the trial court, to maintain the status quo.

[2] We will simplify the facts where the complexities are not relevant. The agreement with Craigmuir was in fact with a limited partnership called Simon Oil Company Ltd., formed by Simon Marketing and other investors.

[3] Craigmuir also submitted an interest letter agreement which provided that appellant Simon, in consideration for Craigmuir's providing certain financing, would pay interest on the $2.8 million loan.

the loan was for a fee which Craigmuir had earned in connection with the transaction; the loan arrangement would permit Craigmuir to receive its fee immediately but allow Simon three years to pay the fee through the letter of credit. The parties do not dispute that Norman's statement was false.

On November 23, 1982, Mitsui issued the letter of credit and on December 6, 1982, the loan closed and respondent TCB lent Craigmuir $2.8 million. Craigmuir used the proceeds of the loan to buy two certificates of deposit at TCB, which, in turn, were used as security for two additional loans, the funds from which were used by Norman for his own purposes. At this point, it is not disputed that none of the proceeds was used to drill oil wells for Simon.

Facts will be added in the discussion.

## Discussion

Appellant Simon contends that the trial court erred in not granting an injunction against respondent TCB to prevent TCB from drawing on the letter of credit. We agree that the trial court erred in its view of the applicable law, and may have erred in not granting the requested injunction.

Respondent TCB contends, and the trial court agreed, first, that the language, "loans drawn . . . in connection with drilling of oil wells" does not limit TCB's entitlement to draw on the letter of credit, and, second, even if TCB is not entitled to draw on the letter of credit, under California law that conduct cannot be enjoined. Neither contention has merit.

### 1. *Letter of Credit*

The "beneficiary of a letter of credit is bound to comply with its terms and conditions; . . ." (*Venizelos, S.A.* v. *Chase Manhattan Bank* (2d Cir. 1970) 425 F.2d 461, 465.) "Thus, a court should not resort to . . . underlying agreements in interpreting a letter of credit. [Citation.] . . . [N]oncompliance with the underlying contract does not affect the issuer's liability unless a reference to the underlying contract explicitly creates a condition for honoring a draft. General references to underlying agreements are surplusage and should not be considered in deciding whether the beneficiary has complied with the terms of the letter of credit. [Citation.]" (*Pringle-Assoc. Mortg. Corp.* v. *Southern Nat. Bank* (5th Cir. 1978) 571 F.2d 871, 874.)

If the letter of credit requires that certain documents be submitted, those documents must be correct: "Presentation of fraudulent documents to a

bank by a beneficiary subverts not only the purposes which letters of credit are designed to serve in general, but also the entire transaction at hand in particular. Falsified documents are the same as no documents at all.'' (*Voest-Alpine Intern. Corp.* v. *Chase Manhattan Bank* (2d Cir. 1983) 707 F.2d 680, 686.)

■ Respondent TCB recognizes these rules but contends that the language, "loans drawn . . . in connection with drilling of oil wells for Simon," does not create a condition, although that language must be included in any statement submitted by TCB to Mitsui. The language, however, cannot be ignored. (See *Colorado Nat. Bank, etc.* v. *Bd. of County Com'rs* (Colo. 1981) 634 P.2d 32, 39; *Marino Industries* v. *Chase Manhattan Bank, N.A.* (2d Cir. 1982) 686 F.2d 112, 118-119.)

The apparent generality of the language may limit the circumstances under which Simon could contend that TCB had not complied with the letter of credit, but those potential problems are not before us. Thus, cases cited by TCB do not apply, because the issue is not whether the letter of credit failed to describe the underlying transaction (e.g. *CNA Mortgage Investors* v. *Hamilton Nat. Bank* (Tenn.App. 1975) 540 S.W.2d 238) nor whether a statement of purpose not required to be included in a beneficiary's statement becomes a condition. (E.g. *Pringle-Assoc. Mortg. Corp.* v. *Southern Nat. Bank, supra,* 571 F.2d 871; *West Virginia Housing Development Fund* v. *Sroka* (W.D.Pa. 1976) 415 F.Supp. 1107.)

TCB contends that the language is merely a "general reference" to the reason that a letter of credit was required; the language simply describes the "purpose" of the underlying transaction, and is intended only to identify *this* loan as distinguished from other loans that Craigmuir might have obtained from TCB.

The argument proves too much. That theory would permit TCB to submit a totally false statement that Craigmuir failed to repay the loans drawn by Craigmuir "in connection with drilling of oil wells," even if Craigmuir had in fact repaid that loan but had defaulted on another loan not involving Simon or oil wells.

Inevitably, TCB's position is that the language means something, but does not mean what appellant Simon claims. We are satisfied, however, that the language, which must be included in any statement submitted by TCB to draw on the letter of credit, means exactly what the words say: "loans drawn . . . in connection with drilling of oil wells for Simon," and not loans drawn by Craigmuir and used for other projects.

Alternately, TCB appears to contend that it was entitled to rely on the statements made by Norman of Craigmuir to the effect that the $2.8 million loan was for a fee earned by his company in connection with the Simon transaction. That contention has no merit.

First, even assuming that TCB was entitled to rely on Norman's statement when TCB made the loan, by the time TCB was entitled to draw on the letter of credit it knew that Norman's statements were false. Moreover, even without this knowledge, TCB was obliged to investigate before it signed the beneficiary's statement. (*Pubali Bank* v. *City Nat. Bank* (9th Cir. 1982) 676 F.2d 1326, 1329-1330.)

Second, before the loan closed, TCB was furnished the tax opinion described above that made clear that the purpose of the loan was to drill oil wells. Had a TCB officer or employee read even the first four pages of that tax opinion, TCB would have known before the loan was made that Norman's statements were either false or required further investigation.

We note that respondent TCB repeatedly contends that a ruling in favor of Simon will undermine fundamental principles of letter of credit law. No such principles are involved: TCB either chose or acquiesced in the language at issue.[4] Nothing in the lengthy record before us suggests that Matsui, Craigmuir, or appellant Simon forced TCB to accept an onerous condition or to make an unwanted loan. Here, as in any contract or letter of credit, different language would have yielded a different result.

In short, TCB may not draw on the letter of credit unless TCB can submit a truthful statement that Craigmuir has failed to repay the loans drawn by Craigmuir "in connection with drilling of oil wells for Simon . . . ."

## 2. *Preliminary Injunction*

Respondent TCB contends that the Commercial Code prohibits enjoining a beneficiary from drawing against a letter of credit. The contention is without merit.

California Uniform Commercial Code section 5114 and Uniform Commercial Code section 5-114 state the issuer's duty and privilege to honor letters of credit. Uniform Code section 5-114(2)(b) provides that "an issuer

---

[4]Respondent TCB might have insisted upon a letter of credit that required only that the loan be identified. ("Craigmuir failed to repay loans made in connection with the Simon-Craigmuir transaction.")

acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.'' The California version includes substantially the same language except that the language, ''but a court of appropriate jurisdiction may enjoin such honor,'' was deliberately omitted.

The reason for the omission was that the ''power to enjoin the honor of drafts drawn upon documents which appear to be regular on their face'' does ''violence to one of the basic concepts of the letter of credit, to wit, that the letter of credit agreement is independent of the underlying commercial transaction.'' (California Code com. to § 5114 [23B West's Ann. Cal. U. Com. Code (1964 ed.) p. 719].)

Section 5114 refers to the duty and privilege of the *issuer.* We assume without deciding that appellant Simon could not have enjoined plaintiff Mitsui as the issuer of the letter of credit from paying respondent TCB had Mitsui chosen to do so. The beneficiary is in a different position.

The difference in rights and duties between the issuer and the beneficiary is defined in the Commercial Code, which provides that the *issuer* ''assumes no liability or responsibility for the genuineness, falsification, or effect of any document which appears on such examination to be regular on its face.'' (Cal. U. Com. Code, § 5109, subd. (2).) The issuer, as noted, may honor a draft or demand for payment ''despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents.'' (Cal. U. Com. Code, § 5114, subd. (2)(b).)

The *beneficiary,* on the other hand, by transferring or presenting a draft ''warrants to all interested persons that the necessary conditions of the credit have been complied with.'' (Cal.U.Com. Code, § 5111, subd. (1); see *Voest-Alpine Intern. Corp.* v. *Chase Manhattan Bank, supra,* 707 F.2d 680, 686.)

Moreover, the beneficiary is in a better position than the issuer to determine compliance with any conditions in the letter of credit—either because the beneficiary is a party to the contract, or, as in this case, is the lending bank which can control the disposition of funds for which it has accepted the letter of credit as security. (See *Shaffer* v. *Brooklyn Park Garden Apts.* (1977) 311 Minn. 452 [250 N.W.2d 172, 178-179].)

In *Steinmeyer* v. *Warner Cons. Corp.* (1974) 42 Cal.App.3d 515 [116 Cal.Rptr. 57], the court, without deciding whether Commercial Code section 5114 would permit it to enjoin the issuer (42 Cal.App.3d at p. 518),

concluded that a preliminary injunction was properly granted against the beneficiary. (*Id.*, at pp. 519-520.) Respondent TCB distinguishes *Steinmeyer* on grounds that the beneficiary was also a party to the contract. That fact should make no difference. Respondent assumed certain duties in accepting a letter of credit that required it to make certain factual statements, which statements, as discussed above, must be correct. No policy is served by permitting any beneficiary to draw improperly against a letter of credit.

The question remains whether the trial court abused its discretion in not granting the injunction. ■ In deciding whether to grant or deny a preliminary injunction the trial court must consider whether the party seeking the injunction is likely to prevail on the merits at trial and the harm that party is likely to sustain if the injunction is denied as compared to the harm that the opposing party is likely to suffer if the preliminary injunction issues. (E.g., *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121].)

The trial court, in denying the injunction, stated that the condition could be read as "just requiring the production of a document by the beneficiary . . . ," and also stated that the Commercial Code appeared to eliminate injunctions. It appears that the trial court, having concluded that Simon was not likely to prevail at trial and that an injunction was improper, did not decide whether Simon would suffer irreparable injury.

Respondent TCB appears to contend that the trial court did rule on the issue of "irreparable injury" in denying appellant Simon's request for a restraining order: "I've read your papers on those equities, . . . I don't think the equities are as balanced as you say." Given the trial court's other conclusions, we doubt that the trial court decided the issue of irreparable injury.

Respondent TCB contends that Simon has made no showing of irreparable injury, because only money is involved. That fact does not prevent the issuance of a preliminary injunction. (See *Fretz* v. *Burke* (1967) 247 Cal.App.2d 741, 745 [55 Cal.Rptr. 879].) Simon did claim that Mitsui would cut off its line of credit if Mitsui were required to pay against the letter of credit. "In the last analysis the trial court must determine which party is the more likely to be injured by the exercise of its discretion [citation] and it must then be exercised in favor of that party." (*Family Record Plan, Inc.* v. *Mitchell* (1959) 172 Cal.App.2d 235, 242 [342 P.2d 10].)

We conclude that the trial court should be given an opportunity to reconsider whether a preliminary injunction is appropriate.

Finally, TCB contends that the appeal, and the request for an injunction are moot. Since TCB still has nearly $2 million to draw against, appellant's request and the appeal are not moot. Although a trial is scheduled for September 12, 1984, appellant Simon has no assurances that the trial will begin on schedule or that the issues will be tried and decided before TCB exercises its next draw in December 1984.

The judgment (order denying preliminary injunction) is reversed. The matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Klein, P. J., and Arabian, J., concurred.